AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| United States of America | |
|---|---|
| v. | Case No. 2:23-mj-06536-DUTY |
| RAICHEL RION MCKENZIE CROSSWELL | |
| Defendant | |

FILED
CLERK, U.S. DISTRICT COURT
12/20/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: _____jm_____ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
12/20/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: _____CDO_____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 5, 2023, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm |

This criminal complaint is based on these facts:

  Please see attached affidavit.

☒ Continued on the attached sheet.

/s/ Greg Myers
Complainant's signature

Greg Myers, FBI SA
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 12/20/2023



Judge's signature

City and state: Los Angeles, California

Hon. Michael R. Wilner, U.S. Magistrate Judge
Printed name and title

AUSA: Derek R. Flores x4896

**AFFIDAVIT**

I, Gregory Myers, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant for RAICHEL RION MCKENZIE CROSSWELL ("CROSSWELL") for a violation of Title 18, United States Code, Section 922 (g)(1): Felon in Possession of a Firearm.

2. This affidavit is also made in support of an application for a warrant to search the following digital devices (collectively, the "SUBJECT DEVICES") recovered from CROSSWELL when she was arrested at the Los Angeles International Airport ("LAX") on December 5, 2023, which are currently in the custody of the Los Angeles Police Department ("LAPD") in Los Angeles, California, as described more fully in Attachment A:

    a. A blue iPhone 14 Pro Max ("SUBJECT DEVICE 1");

    b. A purple iPhone 14 Pro Max ("SUBJECT DEVICE 2"); and

    c. A T-Mobile SIM card bearing SIM card number 89012606087537449333 ("SUBJECT DEVICE 3").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 922(g)(1) (Felon in Possession of a Firearm) and Title 49, United States Code, Section 46505(b)(1) (Attempting to Carry a Weapon on an Aircraft) (the "Subject Offenses"), as described more fully in

Attachment B.  Attachments A and B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.  I am a Special Agent ("SA") at the Federal Bureau of Investigation ("FBI") and have been since December 2020.  I am currently assigned to the LAX office of the Los Angeles Division, where I investigate federal crimes that pertain to aviation.  I have participated in and conducted investigations of crimes that occur both onboard aircraft and crimes that occur within the aviation environment.  These include cases related to felon in possession cases as well as cases related to passengers attempting to bring weapons through the security checkpoints.  I have received both formal and informal training from the FBI and other institutions regarding federal firearm investigations and the review of digital devices.  As a Special Agent, I completed the FBI Academy in Quantico, Virginia, and received training to include the fundamentals of law, ethics, interviewing, report

writing, firearms, surveillance, defensive tactics, and case management.

### III. SUMMARY OF PROBABLE CAUSE

6. On December 5, 2023, at LAX, CROSSWELL entered a security checkpoint at LAX and placed her grey backpack on an x-ray machine conveyor belt. When a Transportation Security Administration ("TSA") officer scanned the bag, the officer saw what appeared to be a gun inside the backpack. An LAX Police Department officer searched CROSSWELL's bag and found a Taurus G2C pistol with serial number ACH114085 inside a small, zippered compartment on the lower left side of the backpack. The gun was loaded with 11 rounds of ammunition, including one round in the chamber. Inside CROSWELL's backpack, the LAX Police Department officer also found two iPhone 14 Pro Maxes (SUBJECT DEVICE 1 and SUBJECT DEVICE 2) and a loose SIM card (SUBJECT DEVICE 3).

7. CROSSWELL had previously been convicted of two felonies punishable by a term of imprisonment exceeding one year: Second Degree Robbery and Attempted Second Degree Commercial Burglary.

### IV. STATEMENT OF PROBABLE CAUSE

8. Based on my review of law enforcement reports, conversations with other law enforcement agents, a review of the LAX Airport Police reports, TSA reports, and interviews with TSA and LAX Airport Police personnel, and my own knowledge of the investigation, I am aware of the following:

**A.   TSA Officers Find a Gun in CROSSWELL's Carry-On Backpack**

9.   On December 5, 2023, at approximately 9:30 a.m., CROSSWELL went to screening lane five of the TSA screening checkpoint at LAX Terminal 4 on her way to board an American Airlines flight.  CROSSWELL then placed her carry-on items, including her grey backpack, on the x-ray machine conveyor belt to be screened.

10.   TSA Officer Kiera Jackson was assigned to the x-ray machine at lane five.  The x-ray machine scanned CROSSWELL's backpack and Officer Jackson saw what looked like a gun inside the backpack on the x-ray image.  Officer Jackson re-ran the backpack through the x-ray machine and saw a clearer image of the gun.  Officer Jackson then annotated the item as "high threat" in the system, causing the x-ray machine to move the backpack to an isolated area on the screening belt for inspection by a supervisor.  When Officer Jackson annotated the bag, she overheard CROSSWELL state that she needed to retrieve her phones from her backpack. CROSSWELL then asked Officer Jackson if she was going to jail.  Officer Jackson did not mention anything about a firearm to CROSSWELL before CROSSWELL made these statements.

11.   At that time, TSA Officer Jason Howell was assigned to the Advanced Imaging Technology ("AIT") machine at screening lane five.[1]  CROSSWELL went through the AIT machine without incident as part of the screening process.  CROSSWELL then

---

[1] An AIT machine is a full-body imaging machine that scans passengers' bodies for contraband.

waited at the end of the x-ray machine for her backpack, noticed that her bag was still in the x-ray machine, and saw that the x-ray machine operator was analyzing an image. During this time, CROSSWELL appeared "frantic" to both Officer Jackson and Officer Howell.  CROSSWELL paced back and forth while waiting for her bag, saw the TSA officers place her backpack at the front of the x-ray machine's conveyor belt to re-scan it, and then attempted to exit the secured area by walking back through the AIT machine.  Officer Howell and another TSA officer stopped CROSSWELL before she was able to exit.  CROSSWELL asked HOWELL if she could retrieve her phone that was in her backpack.  Officer Howell told CROSSWELL that she could not retrieve her phone because the backpack was still being processed.  CROSSWELL then indicated she knew something illegal was in the bag, stating to Officer Howell, "my peoples [SIC] left something in my bag" and "it's my brother's and my brother is a cop."

12.  TSA Supervisory Transportation Security Officer Brianna Wright responded to screening lane five.  Officer Wright reviewed the x-ray image and determined that it showed a gun.  Officer Wright then contacted LAX Police and TSA Transportation Security Manager Jonathan Ovalle.

13.  Manager Ovalle responded to screening lane five and met with Officer Wright and Officer Jackson.  Manager Ovalle reviewed the x-ray image of CROSSWELL's backpack and saw what he believed to be a gun.  Manager Ovalle introduced himself to CROSSWELL who was waiting near the x-ray machine at lane five.  Manager Ovalle asked CROSSWELL, "Is this your bag?"; CROSSWELL

said it was.  Manager Ovalle asked CROSSWELL, "What do you have in the bag?"; CROSSWELL said that she had cannabis, perfume, and phones.  Manager Ovalle asked CROSSWELL if she owned a gun; CROSSWELL said that she did not.  Manager Ovalle then told CROSSWELL that there appeared to be a gun in her backpack and that law enforcement officers were on their way to look at the backpack.  CROSSWELL indicated to Manager Ovalle that she "grabbed the first bag she saw."

14. LAX Police Department Officers Pointer and Hernandez then arrived at screening lane five.  Officer Pointer reviewed the x-ray image of CROSSWELL's backpack and saw what he believed to be gun.  Officer Pointer searched the backpack and found a Taurus G2C pistol with serial number ACH114085 inside a small, zippered compartment on the lower left side of the backpack (the gun was the only item in that compartment).  The gun was loaded with one round in the chamber and 10 rounds in the magazine.

15. LAX Police Department officers detained CROSSWELL and Officer Pointer asked her if she had packed her own backpack and what items were inside the backpack. CROSSWELL responded, "Uh, marijuana, I got a charger, shit, a weed tray, shit, nothing else. I mean my security; he has my bag and he probably has a firearm in there. It's probably in a secret compartment."

16. Inside CROSSWELL's backpack, Officer Pointer also found what appeared to be cannabis, a blue iPhone 14 Pro Max ("SUBJECT DEVICE 1"), a purple iPhone 14 Pro Max ("SUBJECT DEVICE 2"), a T-Mobile SIM card bearing SIM card number

6

89012606087537744933 ("SUBJECT DEVICE 3"),[2] $6,809.00 in cash, and various personal items. Officer Pointer then arrested CROSSWELL for carrying a concealed firearm in violation of California Penal Code § 25400.

### B. CROSSWELL Has Two Prior Felony Convictions

17. On December 5, 2023, I obtained and reviewed CROSSWELL's criminal history report, California Law Enforcement Telecommunications System ("CLETS") criminal history report, and Los Angeles County Consolidated Criminal History Report System ("CCHRS") criminal history transcript.

18. According to those records, CROSSWELL had been convicted of the following felony crimes punishable by imprisonment for a term exceeding one year prior to December 5, 2023:

    a. Second Degree Robbery, in violation of California Penal Code Section 211, on or about September 12, 2017, in the Superior Court of California, County of Riverside, Case Number BAF1600850; and

    b. Attempted Second Degree Commercial Burglary, in violation of California Penal Code Sections 664, 459, on or about March 16, 2021, in the Superior Court of California, County of Los Angeles, Case Number PASGA10797604.

---

[2] SUBJECT DEVICE 3 was found as a loose SIM card inside CROSSWELL's backpack; it was not inserted into SUBJECT DEVICE 1 or SUBJECT DEVICE 2.

### C. CROSSWELL Admits that the Backpack Is Hers and that She Knew She Had Been Convicted of at least One Felony

19. That afternoon, FBI TFOs and LAPD Detectives Pitwalai Pamela Meesri and Alison Dora Meier interviewed CROSSWELL. Before beginning the interview, TFOs Meesri and Meier read CROSSWELL her <u>Miranda</u> rights. CROSSWELL waived those rights and agreed to speak with the TFOs.

20. Among other things, during the interview:

    a. CROSSWELL confirmed that she had at least one felony conviction but was unsure about the second conviction. She stated that the first felony conviction was for biting a loss prevention officer during a robbery at the Cabazon Outlets in California. When asked about a felony conviction in 2021, CROSSWELL recalled that she was looting at a liquor store in Pasadena. CROSSWELL stated that she believed that a firearm prohibition was a condition of her probation.

    b. When asked about what happened at the airport, CROSSWELL stated that the grey backpack was hers, that she was a musician, and that she often hires security guards. CROSSWELL stated that her security guards carry her backpack for her and sometimes store guns in the backpack. When asked if her fingerprints would be on the firearm, CROSSWELL replied, "It might be on there if, it's, um, like, um, one of the guns that have already been in the bag that I have given them before if they aren't cleaning it."

**D. Law Enforcement Records Indicate the Gun Was Purchased in Arizona and Never Registered in California**

21. On December 18, 2023, I obtained a firearms trace summary for the gun recovered from CROSSWELL's backpack on December 5, 2023, from the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). According to ATF records, the gun was purchased in Arizona on August 25, 2021, by B.S. There is no record of the gun being registered in California.

**V. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

22. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct firearms investigations, I am aware of the following:

    a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

    b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These

9

photographs and recordings are often shared via social media, text messages, and over text messaging applications.

       c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale.  In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

       d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

23. As used herein, the term "digital device" includes the SUBJECT DEVICES.

24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

25.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

      a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

      b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

26. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

27. For all of the reasons described above, there is probable cause to believe that CROSSWELL has committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm, and that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  20  day of
December, 2023.

_____
HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE

13